Our first case up for oral argument this morning is Schoenthal v. Kwame Raoul et al., Appeal No. 24-2643 and 24-2644. Good morning. Good morning, Your Honors. I'm Deputy Solicitor General Alex Hemmer for the State Defendants. This morning I'll address the Bruin analysis and my colleague Mr. Byer will address the issues raised in the county's brief. I hope to reserve two minutes for rebuttal. The public transit restriction accords with our nation's historical tradition and so is constitutional under Bruin for two independent reasons. First, the restriction descends directly from a tradition of restricting access to firearms that are loaded and unsecured in passenger railroads in the 19th century, which itself descends from a tradition of restricting access to firearms in crowded spaces. Second, the restriction is analogous to those locations in which the Supreme Court has held that states have brought authority to restrict access to firearms. Like these sensitive places, public transit systems are owned and operated by the government, they're characterized by crowded and confined spaces, and they're full of vulnerable individuals. Upholding the district court would require breaking from the Second Circuit's opinion in Antonyuk and the Ninth Circuit's opinion in Wolford. The court should instead follow those decisions and reverse the judgment below. Unless the court has a contrary preference, I'll begin with the railroad analogy and then turn to the sensitive places analogy. As the Ninth Circuit explained in Wolford, a statutory regime like Illinois' in which individuals can transport unloaded and secured firearms on public transit but can't carry loaded and accessible firearms on those systems is constitutionally permissible under Bruin. That's because it's analogous to a historical tradition of restricting access to loaded and unsecured firearms in passenger railroads in the 19th century, which itself descends from a longer tradition of restricting access to firearms in crowded spaces. We're talking about private regulations and we have public transportation here. How far does your argument go with respect to private regulations at Bruin's second step? In other words, is there a limiting principle? Can we always look to private? Should we always look to private? What kind of a nexus is necessary, if any? Yeah, of course, Judge St. Eve. I mean, I think there are multiple kind of overlapping reasons why it's appropriate to look to the railroad rules that we cite here. But if the court is looking for a limiting principle, I do think it's important that in the 19th century, railroads weren't ordinary corporations. They were understood, and the U.S. Supreme Court explicitly described them this way, as quasi-public corporations. They could exercise eminent domain. They were subject to mandamus actions. They undertook public duties. So I think that the court could easily say, you know, setting aside this sort of broader question of whether private rules are, you know, an appropriate analogy, they are here because of the unique characteristics of these private railroads. But I do think there are other kind of broader reasons that considering private rules are appropriate. I mean, we know from Bruin that, you know, the Supreme Court itself did it in describing the kind of permissibility of restrictions at schools. It's cited to a couple of secondary sources that themselves kind of looked primarily to private university rules rather than public university rules. Did Rahimi pull back on that at all in any way? I don't think so, Your Honor. No. I mean, I don't think this is a kind of question that Rahimi really gets at one way or the other. I think we kind of have to look to Bruin. But I do think Justice Barrett's concurrence in Rahimi sort of, you know, gets at this a little bit. She says one kind of fallacy that courts might engage in in applying Bruin too strictly is to think that legislatures, that sort of public bodies, would kind of maximally exercise their ability to regulate. And the Second Circuit's Antonyuk opinion has a good analogy here. It says, you know, if there's only one daycare in a city or a state and that daycare says, you know, you can't bring guns, then we wouldn't expect to see the city or the state kind of enact a similar public regulation. So in that sense, private rules are at least relevant, I think, you know, in almost any  But I don't think the court needs to kind of get into all of that here because of the uniquely kind of quasi-public nature of the railroad rules. And I do think the railroad rules are otherwise setting aside the kind of private nature of the companies, relevantly similar analogs. They are relevantly similar to Illinois' law in both the how and the why. You know, as to the how, both the public transit restriction and the railroad rules operate in the exact same way. They allow people to transport firearms from place to place, but not to carry them in a loaded and accessible manner. And as to the why, both Illinois' law and the railroad rules are motivated by the same concern, namely a concern for passenger safety in crowded spaces. The district court's primary objection here was the sort of private nature of those rules, which we've discussed. But setting aside that objection, you know, which we think was incorrect, we think the railroad rules are a kind of sufficient analogy to justify the constitutionality of Illinois' law under Bruin. Would those railroad rules standing alone be enough, or are you relying on earlier colonial and post-colonial rules and regulations? We are relying on, as we explained in the brief, the railroad rules kind of descend from this broader tradition, you know, dating back to Northampton, but certainly sort of bolstered by several colonial statutes and kind of common law rules. And then a much broader kind of set of restrictions in the 1800s around access to firearms in crowded spaces. So this is Missouri, Tennessee, Texas, New Mexico. You know, I think the Second Circuit says that this kind of set of 1800s-era statutes covered between kind of 10 and 15 percent of the population of the United States, and many of them were upheld in state Supreme Court opinions. And in the briefs, you rely on this government as a proprietor rationale as well. I see your time's running short, and you haven't mentioned that, but do you think it's necessary for us to get to that? I don't think the court needs to get to that. I think it can rely kind of just on the arguments in the first half of the brief if it wants to. You know, the arguments we kind of make in the second half of the brief kind of go to a separate way of understanding this question, which is to analogize the railroad rules to those sensitive places that the Supreme Court indicated in Bruin are kind of permissible, you know, sites of government regulation because of their nature, schools, courthouses, legislative assemblies, polling places. And as we explain in the brief, public transit shares many common characteristics with those locations, including that the government kind of has a proprietary interest in maintaining order and ensuring safety in those spaces, both, you know, because that's its role and because it wants to kind of avoid the liability that occurs when, you know, there are gunfire incidents in public transit. There's also the kind of crowded nature of both the locations set out in Bruin and the public transit restriction, and the fact that there are vulnerable individuals on public transit, just as there are in many of the Bruin locations. So we think the court can, you know, rely on kind of the first half of the brief, it can rely on the sensitive places analogy in the second half of the brief, or as Antoniuk did, it can kind of borrow from both. It can say, you know, there are some common characteristics with these locations. We don't have to decide whether that would be enough standing alone because we also have these direct analogies in the railroad rules. How do you respond to the argument that some of the laws you're relying on required evil intent in addition, in order to preclude somebody from carrying it? Sure. What do we do with that? Because that's not part of the law here. No, that's true. That's true, Judge St. Eve. So this is an objection to Northampton and to the two colonial laws. Correct. There's no intent requirement in any of the 1800s era laws that we cite, and I think the answer is, you know, kind of as Antoniuk explains, and as Rahimi says, you don't have to have kind of a historical dead ringer, you know, what we're looking for is a principle. And the principle here is that the government can restrict access to firearms in crowded spaces, and legislatures took that kind of rule, even if it was once coupled with an intent requirement, and expanded it in the 1800s to, you know, kind of more broadly prohibit firearms in these locations. See, my light is on. I'll try to reserve the remainder, if that's all right. Thank you. Thank you. Mr. Pryor. Good morning. Good morning. Good morning, and may it please the Court. This Court should reverse for two reasons in addition to the reasons set forth by my friend at the Attorney General's office. First, the plaintiffs lack standing to seek a declaration as to the constitutionality of the public transit statute. The Supreme Court explained in California that federal courts lack jurisdiction to issue freestanding declarations of a statute's unconstitutionality. Rather, they must assess jurisdiction by looking to the other relief requested. But plaintiffs abandon the request for injunctive relief, and abandoned claims cannot form the basis of federal subject matter jurisdiction or Article III jurisdiction. Regardless, even if they had not abandoned that claim, an injunction would not redress their inability to bring guns on public transit, since it is undisputed that all the entities at issue here, all the transits at issue here, independently prohibit firearms on their property. Second, turning to the merits, this Court analyzes regulations of public transit under the Unconstitutional Conditions Doctrine that was set forth in St. Joan Antietam, if I pronounced that correctly, and that's undisputed here. And plaintiffs also do not seriously dispute that that doctrine is satisfied here, if it applies. Rather, they focus on the idea that Bruin somehow exempts the Second Amendment from the general body of law that applies to, as far as I can tell, every other constitutional amendment that has ever been invoked in. But that's just simply not the law. That is not what Bruin did. Bruin did not lay waste to the government proprietor principle that underlies cases like Inquist, that underlies the property cases, and that underlies the Unconstitutional Conditions Doctrine. Indeed, this Court, very recently, in Miller v. Smith, remanded a case specifically for the District Court to consider the Unconstitutional Conditions Doctrine, but plaintiffs do not even address Miller in their briefs or explain why Miller was wrongly decided. I welcome this Court's questions. You're asking us to find no redressability here. That's correct. And if I understand your argument correctly, you're relying on the Supreme Court's opinion in Brackeen and arguing that because METRA and CTA have ordinances that could be prosecuted through the Illinois Trespass Law, that they would not get the relief that they're seeking here if we find the Illinois law either constitutional or unconstitutional. Is that correct? That's correct. It's kind of a giant reset button. This Court does not have power to, I believe the Supreme Court has put it, once this Court recognizes a lack of jurisdiction, it has only the power to note the lack and dispose of the case on that ground. So that's where we would be here. But yet you're jumping to the end of your argument. The application of Brackeen, you're asking for a pretty broad application of it that I don't think any other court has done so far. I don't think that's correct with respect. I believe that Rennie was one of the first from the Supreme Court, was one of the first to observe these problems with when multiple laws independently act to prohibit desired conduct. And that's the focus here. Desired conduct. As one person put it in describing this case, that this case is about the fate of those little red signs you see at the entry to CTA or METRA, the no gun signs. Whatever happens here, those signs are still going to be there. Is the law at issue here broader than the CTA and the METRA law? Not in any realm of respect that I'm aware of and nothing that the opposing parties have noted. It is public funded transit and that is exactly what CTA and METRA are. They were in fact created by Illinois when the private transit systems collapsed. Does it matter that the law at issue here has broader penalties than the other laws? Just because they are facing, I think, up to a year penalty for the statute at issue here, whereas the trespass law is only up to six months. No, it does not. Because the basis for standing, for challenging, for seeking injunctive relief of a potential application of a criminal law, focuses on conduct that's affected with a constitutional interest. That's the core of what they're doing. And that's how they identified their injury below when they brought this suit. We want to bring guns on these trains for various reasons about our concern, about our fears. They can't do that even if this law is set aside and the CTA, I believe, has filed an amicus explaining that they intend to continue following that law or their own laws. The plaintiff's complaint mentioned 430 ILCS 6665, but also said in all related laws, regulations, policies, and procedures, wouldn't the METRA and CTA trespass ordinances fall under those related laws, regulations, policies, and procedures? They would not. They were not issued, they were not promulgated under the public transit statute. Those were their own independent decisions. They're independent. They're these government corporations that have their own rules, almost like ordinary property owners. They issue their own rules and regulations governing their systems. And it's never been argued that those two are linked in a statutory way. And I would point out, I'm sorry, may I finish my answer? Yeah, please. I would point out that Holland completely forecloses the idea that plaintiffs offered in their response that wiping out the public transit statute would also have the effect of getting rid of these other rules. Holland explains that's not how judgments work. That's not how Article III works. You're bound by the judgment. The judgment here would only affect the laws that are being challenged and the parties that are actually before this court. CTA and METRA are nowhere to be found other than an amicus brief. If Brackeen doesn't apply, is there a redressability problem? Or do you really need that case to prevail under redressability? I don't think we need Brackeen because we've got HAARP advertising. And in particular, to address your concern about the concerns of the panelists expressed about broader penalties, we've got the Sixth Circuit's decision in White, which involved a challenge to a federal statute where the court specifically held that there was no redressability and no standing because there were state laws that prohibited the exact same conduct. Obviously, the federal law was adding something that the states didn't. That's the nature of our dual sovereignty system. But nevertheless, White found no jurisdiction, held that there was no jurisdiction there for lack of redressability. And we've cited case after case after case and made clear, if the bottom line, the signs in HAARP, if you can't put up your sign, then you're out of court. That's just how redressability works. If this court has no further questions, I will reserve the random rec time. I'll give you a minute. You're back for rebuttal. Thank you. We kept you up here. Thank you. Morning, Mr. Ohlendorf. Morning, Your Honors. May it please the Court, John Ohlendorf for the appellees. When the Second Amendment was ratified in 1791, which this court has said is the critical year for determining the amendment's historical meaning, defendants have pointed to no firearms restrictions specific to public transit during that era. Instead, they rely on the tradition of restricting firearms in so-called sensitive places. But Bruin identified only three such sensitive places at the founding. Legislative assemblies, courthouses, and polling places, and none of those are remotely analogous to public transit facilities. The feature that unifies those three places at the founding is that the government undertook in those locations to provide comprehensive security. The government does do that in places today, including this courthouse, which we all saw when we came in this morning. But anyone who has ever ridden on the L will tell you that the government does not similarly undertake to comprehensively secure that location. Was that true of all sensitive places? Did courthouses have the same security in the founding era? Did polling places? They did all have robust security, Judge Kolar. I think every state except for Connecticut, we've found, had secured entrances with doorkeepers at legislative assemblies. Every state had a robust police presence at courthouses by statute, and many did at polling places as well. Now that security at the founding looked different than it does today, in part because the lethality of weapons has changed. That's true. And so today, what it means to comprehensively secure a location is quite different at the founding, and we all know what it means. When the government... There's a difference between calling some place a sensitive place and making it and treating it like a sensitive place. When the government actually wants some place to be a sensitive place, we all know what it does. It secures the entrances. It has guards, magnetometers, and so forth. That is the modern analog to what was happening at these three sensitive places at the founding. Mr. Olandoffer, I want to go back to standing, and I know the Cook County's reply brief is really what addressed, at length, the redressability point, and Brackeen, I'd love to hear your response, and before you respond to Brackeen, can you clarify for me what are you claiming the injury is here? So thank you for that question, Judge St. Edmund, and especially that end of the question, because I think that the most straightforward answer to Cook County's standing objection here is that they've mischaracterized our injury. What is your injury? The injury that we are claiming is that my clients face a threat of prosecution by the state officials under Section 65A8. That's the specific injury, and that's well settled in a constitutional pre-enforcement challenge under Babbitt, right? It's well settled that that's the injury. You're facing a threat of prosecution under a statute that you say is unconstitutional, and there's just no question that after the district court's judgment declaring that law unconstitutional and unenforceable as applied to my clients, they do not face that threat of prosecution. But you would still face the threat of prosecution under METRA and CTA's ordinance through the So how, if we agree with you, how is your injury redressed if you still face that additional prosecution? The injury is redressed, Judge St. Edmund, because again, the injury is the specific threat of prosecution that we faced under the law that we challenged, and that injury is gone. Now, we may face other obstacles to ultimately carrying a firearm on public transit. You face the threat of prosecution under this other statute. Under a different statute? Well, under the rules of the METRA and the CTA and so forth, and ultimately under... Under the Illinois trespass is ultimately what the prosecution would be. That's correct, Judge St. Eve, and so that's a different injury. Certainly I think if my clients feared prosecution under that statute after this district court's judgment were to be affirmed, they could come into court pretty quick, get a declaratory judgment against that threat as well. But that would be a separate judgment. That would be a separate judgment, Judge Koldar, but here's another way to look at it. If one of my clients had been prosecuted, had actually, instead of bringing this pre-enforcement challenge, had carried his firearm onto the L and had been prosecuted under Section 65A8 for doing that, there is no question that he would have had standing to raise the Second Amendment as a defense to that prosecution. Even though the county officials, the CTA and METRA would not have been parties to that lawsuit, even though he hadn't been prosecuted under this trespass law, there's no question he could have raised that Second Amendment defense and would have had standing to do so. The whole point of a constitutional pre-enforcement challenge is to just preemptively bring that same challenge, that same Second Amendment defense. And it just follows that they're standing here, again, because we have an injury in fact. We're facing a threat of prosecution under a specific statute that's traceable to the enforcement of the statute, and the district court's declaratory judgment just does away with that injury. None of my friends' cases address this situation. How do you square that with Holland if your client still can't bring a firearm onto the public transit? Holland was not a case that involved any threat of criminal prosecution. I understand that. And so it just doesn't address, none of the, I mean, most of the... But it talks about the effect of the judgment. It did.  The judgment. And you're saying you would need a separate judgment to do what you want to do. Well, and Judge Kullar, that goes to kind of, I guess I would say, my backup answer to the standing question, which is, even if you think that the removal of the threat of prosecution under Section 65A does not suffice for Article III standing, which I think it clearly does, but even setting that aside, it would take a lot of hardyhood for the same state's attorney to come back into court bound by a declaration not to enforce this statute and to say, aha, I can get you on this other statute. They would be, certainly the judgment wouldn't give us an entitlement of itself to a judgment against that conduct. They would be bound as a matter of issue preclusion from relitigating the Second Amendment issue. And I think, you know, we cite the Maldonado versus Morales case from the Ninth Circuit, which I think is in a very similar profile. I think that does create enough of a likelihood that this alternative injury would not transpire to get us across the line. But again, my primary argument to you is, we have an injury in fact. It's the one that we pleaded. It's the one that the district court found. We face a threat of criminal prosecution. His judgment does away with that injury in fact. That is all. Only from this statute, though, it sounds like you're saying that we have to look at the alleged harm just in terms of the one statute, not the potential prosecution based on the other one. That, I think, is the injury that we pleaded, and it clearly a threat of criminal prosecution is an injury in fact that suffices for Article III purposes. And when it's looked at in that very specific way, it seems to me that there's no question that we have an addressable injury in fact in Article III standing. I'm happy to answer other questions about standing, but if not, just to move to the merits for some time here.  One more question on standing. If we don't, talk to me about footnote, I believe it's 10, where the district judge relies on the sham affidavit analysis to indicate that you can't rely on the decal bus system. Was there enough in the deposition that established that as an injury that would be fully redressed in the sense that the CTA and metro regulations wouldn't apply? You know, I haven't thought about that specific aspect of that issue, Judge Collard. Certainly, we did not appeal that portion of the district court's footnote. We'd be happy to submit letter briefing if that's a topic that is specifically troubling you, but standing here today, I don't have an answer specific to the decal bus line. My friend did bring up their California versus Texas declaratory judgment objection. I think with all respect, I think that's fairly insubstantial. I think the analysis that California sets forth and that the Supreme Court set forth in 1933 is that you ask if, hypothetically, a plaintiff had sought a traditional form of relief, would that have shown that there was injury in fact and redressability? You don't also have to bring a prayer for that type of relief in addition to your declaratory judgment prayer in order to have that standing, and that was settled since 1933. Moving to the merits, today, my friend placed, I think, the greatest weight on the railroad rules from kind of the late 19th century. I think the first and really dispositive objection to their reliance on those rules is that those are private rules. They're akin to, you know, my rule in my household that my kids can't have guns. The Second Amendment doesn't stand in the way of that, and conversely, it tells you nothing about the scope of the Second Amendment. These railroads were private actors who were not subject to the Second Amendment. The whole purpose of looking at a tradition of firearm regulations is to say, what was it understood the state could do that was kind of carved out traditionally and historically from the textual right to keep and bear arms? And asking what private companies did just has no conceivable bearing on that analysis. It tells us nothing about what state actors bound by the Second Amendment can do consistent with the Second Amendment. I think that objection is really dispositive. They point to kind of the school example, which they tie to Bruin. Number one, I don't think Bruin really dispositively settles the status of schools. It mentions schools like Heller mentioned schools, but then when it comes down to defining the three specific sensitive places that did exist at the founding, it doesn't mention schools. And in any event, it didn't cite any private school regulations. It cited a law review article that in turn cited a number of different things, including public school, state school rules. So I think it's really quite the attenuated leap to look from Bruin citation to a law review citation to private rules that Bruin somehow blessed looking at private rules of conduct in determining the Second Amendment scope. I also think those railroad regulations come too late. Again, this court said in Moore v. Madigan that 1791 is the critical year. I think it indicated again recently in the Rush decision. Didn't Bruin really dispel that though? Because Bruin said specifically that you can look when the 14th Amendment was ratified in 1868. Well, I don't think it said that. I think Bruin leaves the issue where it found it. It says there's this historical debate about which is the critical period. We're not going to address that because we think whichever way you answer that question, there's sufficient evidence that New York's law is not historically grounded. That's why it looks at 1868, because it avoided deciding the 1791 v. 1868 decision. So I think it leaves the issue where it found it. And before Bruin, in Moore, this court said 1791. After Bruin in the United States v. Rush decision, I take it to say that really the greatest weight should be given to 1791. And that also accords with, outside of Bruin, two strands of well-settled Supreme Court jurisprudence. The first of which is there's no daylight between a Bill of Rights provision is applied to the states and applied to the federal government. It said that repeatedly. It said that in McDonald, specifically rejecting Justice Stevens' dissenting opinion on that point. There's no daylight. So the answer has to be 1791 or 1868 as to both. And it's a very odd reading that would say that the federal government, which has been bound by the Second Amendment since 1791, somehow had the meaning transformed in 1868 so that it's now bound by a different meaning. And the Supreme Court has always looked, when analyzing Bill of Rights restrictions, as applied to the federal government to 1791. So I think it follows from those two strands of Supreme Court jurisprudence, which Bruin left undisturbed, that the key point is 1791. And so railroad regulations that don't come onto the scene until 1875 are just too late. What about the comment in Bruin that how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represents a critical tool of constitutional interpretation? That doesn't end at 1791. That's right, Judge Saint-Even. And again, I think the reason that Bruin said that is precisely because it left this question open, undisturbed. If it wanted to set aside and say, if it wanted to say something different than that, right? It sounds like you're asking us to disregard that. No, I'm not asking you to disregard it. Bruin didn't decide it the other way. It didn't say 1868 is the date. It just said, we leave the question undecided. If it had wanted to say, we're going to stop the clock in 1826, 1830, then it would have had to decide that question. Because it didn't decide that question, then it necessarily had to look through the end of the 19th century to show that the decision of that question was unnecessary. But it left the issue where it found it. And our argument is not that Bruin decided it our way. We agree it didn't decide it our way. Our argument is that two other lines of precedent that the Supreme Court left undisturbed dictate that the result should be 1791. That's what three circuits upheld. That's what the Eighth Circuit held in Worth, what the Third Circuit held in Lara, what the Fifth Circuit held in Reese. I think it's a fair reading of what the en banc 11th Circuit said in the NRA versus Bondi case. So I think we have the weight of authority at our backs on this issue. I also think it really makes sense that if you were looking for historical evidence bearing on what the meaning of the Second Amendment was, you would look at the period when the people debated and adopted it. I see, Your Honor, my time is expired. Thank you. Mr. Hammer, rebuttal? We'll give you two minutes. Thanks. Thank you, Your Honors. I'd like to hit two points if I can. So first, I want to address plaintiff's kind of comprehensive security theory, which they kind of suggest as the unified principle for all sensitive places. I think this theory is flawed on so many levels. I mean, taking a step back, this theory has been rejected squarely by the Ninth Circuit and the DC Circuit. So if the court were to adopt it, it would be a kind of extreme outlier. Has any circuit adopted it? I believe there's one district court that has adopted it. No circuits. I didn't see any circuits. No, that's correct. And not for lack of advancement by kind of plaintiffs similarly situated to these plaintiffs. It requires, as my friend said, the court to presume that schools are not a sensitive place because there's really no argument for comprehensive security in schools. That proposition, I think, would very much surprise both the majority and several of the concurrences in Bruin, which expressly mention schools as a sensitive place. And more broadly, as we explained in the reply brief and as the Everytown brief sets out, it requires just a kind of understanding of the historical record that is not correct. The kinds of doorkeepers and kind of ministerial officials that plaintiffs point to did not have security responsibilities for legislative assemblies and courthouses in the time period that he's describing. I also want to address the point that the historical analogs we're offering are too late. Don't think that's correct. You know, it's a relatively straightforward analysis here to just say, you know, we have offered a kind of line of historical analogies that begins as early as Northampton, that stretches through the founding era, and to multiple state statutes during the 1900s. I don't think the court needs to get into kind of broader questions of, you know, could a statute survive that was kind of justified only by Reconstruction-era statutes, because that's not the argument that we've made here. Even if it were, I think there's a, you know, really strong argument that the 1800s, for the reasons that you set out, is a highly probative kind of time period, especially for state firearm restrictions, given that our, you know, assent to the Second Amendment was kind of effectuated through the 14th Amendment during the Reconstruction era. So for all of those reasons, if the court has no further questions... Thank you, Mr. Hemmer. We'd like to ask the court to reverse.  Will you please respond to the argument that for redressability, we look at the injury specific to the statute at issue? I...regarding that, I just don't think I see anything in the cases that support that. And again, I keep coming back to the White case, which, at this point in the litigation, I don't believe my friend on the other side has even mentioned that case, let alone explained how that's remotely reconcilable with their belief that the fear of prosecution is the injury. Because that's just not the law. The fear of prosecution, the real credible threat of prosecution is what makes the injury and not being able to engage in conduct effective with a constitutional interest tangible. It gets it past that speculation about injury problem. So it's a different part of the entire analysis that they're focusing on. We're talking about redressability here. Redressability goes to, can I engage in that conduct effective with a constitutional interest? And frankly, I see no way to reconcile their theory of the case with White without creating a substantial circuit split on a question of Article III jurisdiction. None has been offered by opposing counsel today. Real quickly, if I may, I apologize for going over with this court's... We'll let you make your last point. To the extent that my friend has claimed that the Supreme Court's decision in California was, quote, insubstantial, I believe the Supreme Court would disagree. They set forth the standard. And to the concept that this is a, that you're allowed to bring a hypothetical claim to support declaratory jurisdiction, the Supreme Court's done away with hypothetical jurisdiction years ago. And also, I would finally note that this is absolutely irreconcilable with the Supreme Court's decision in Calderon versus Ashmus, where a plaintiff sought to bring a freestanding declaratory judgment claim regarding a habeas statute, didn't bring an actual habeas claim, and the Supreme Court said, you can't do that, that this is not an Article III thing. This is getting into the territory of advisory opinions. And that's just not what this is. Thank you, Mr. Brown. Thank you so much. We respectfully request you reverse. Court will take the case under advisement.